# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                    **Plaintiff,**

            **v.**

DETROIT MEMORIAL PARTNERS,  LLC,
and MARK MORROW,

                    **Defendants.**

**Civil Action No.**
**_____**


**JURY DEMAND**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its complaint and alleges that:

## OVERVIEW

1.     This case involves the fraudulent offering and sale of approximately $19 million in notes and $4.5 million in "equity interests" by Detroit Memorial Partners, LLC ("DMP") and its principal, Mark Morrow.   DMP, which purported to be in the business of operating cemeteries, made material misrepresentations and omissions to investors who purchased promissory notes and equity interests issued by DMP.  Most significantly, DMP and Morrow misrepresented that it owned various cemetery

properties and that the notes would be secured by those properties in Michigan.  In fact, DMP did not own any cemetery properties when most notes were sold and none of the notes were secured.  Defendants also misrepresented that the proceeds from the notes would be used to acquire and manage cemeteries.  In fact, significant amounts of the proceeds were used to fund Morrow's personal equity interest in DMP, for high risk trading in securities and to pay interest owed to other DMP note holders.

2.      A total of approximately $19 million in DMP notes have been sold to at least 190 investors in multiple states.   Substantial investor funds are missing and unaccounted for.

3.      Morrow and DMP also raised approximately $4.5 million from several investors in return for equity interests in DMP.  Morrow told at least two of the equity investors that DMP was debt free.  In fact, DMP owed significant debt as a result of the note offerings.

## **VIOLATIONS**

4.      The Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

2

5.     The Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)].

6.     The Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v  and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties and for other equitable relief.

8.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

3

9.     Defendants, directly and indirectly, made use of the mails, the means and instrumentalities of interstate commerce and the means and instruments of transportation and communication in interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

10.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  Some of the note purchasers as described herein reside in the Northern District of Georgia.

11.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

### THE DEFENDANTS

12.     **Mark Morrow**, 51 years of age, is the managing member of DMP. Morrow resides in Cincinnati, Ohio, and has held a number of securities licenses, including series 7, 9, 26 and 42 licenses.  Morrow has been in the securities industry since 1987, and he was associated with Landmark Investment Group, a registered broker dealer, from 1999 to October 2012.

4

13.     Morrow was a long time business associate of Angelo Alleca, an Atlanta resident.  Alleca and his advisory firm, Summit Wealth Management, Inc. ("Summit") are defendants in a related action styled *SEC v. Alleca, et al.*, 1:12-cv-03261-WSD (N.D. GA).  Morrow and Alleca initially met while each was employed by Olde Discount Corporation, which is now defunct, and later joined together to operate a joint broker-dealer and investment advisory business.

14.     Prior to the offerings discussed in this complaint, Morrow and Alleca split up their businesses, with Morrow taking the broker-dealer side of the business (Landmark Investment Group, Inc.) and Alleca keeping the investment advisory business (Summit).

15.     **Detroit Memorial Partners, LLC** is a Delaware limited liability company.  DMP owns a 49% equity interest in Midwest Memorial Group, LLC ("MMG"), which owns and operates 28 cemetery properties in Michigan.  DMP's "principle place of business" is Morrow's house in Ohio.

## DMP AND MMG ARE FORMED TO PURSUE THE ACQUISTION OF CEMETERIES

16.     In 2007, Morrow decided to pursue a bid to purchase 28 cemeteries in Michigan that were in receivership.  In September 2007, he formed DMP to facilitate the purchase of the cemeteries.

17.     Morrow owns a 39% membership interest in DMP and is DMP's managing member.  Pursuant to the DMP operating agreement, Morrow maintains complete operational control over DMP.

18.     According to the DMP operating agreement, two thirds of the membership interests must approve any change to the managing member or any change in the DMP ownership interests.

19.     Given that Morrow controls 39% of the membership interests, he has veto power of any change in the ownership structure of DMP and cannot be removed as managing member without his consent.

20.     Morrow convinced a wealthy businessman, whose wife was a client of Summit, to invest approximately $22 million for the acquisition of the cemeteries. Rather than contributing through DMP, the businessman formed Westminster Memorial Group, LLC ("Westminster"), to invest in the venture.

21.     DMP and Westminster formed Midwest Memorial Group, LLC ("MMG") to be the actual purchaser of the cemeteries.  DMP owned 49% of MMG and Westminster owned 51%.

22.     The MMG operating agreement contains a "waterfall" provision with respect to MMG distributions of profit that gives Westminster certain preferences

over DMP, including the right of Westminster to recoup 100% of its capital contribution before DMP was entitled to any distributions.

23.     The MMG ownership structure was negotiated and approved by Morrow before the first DMP promissory notes were sold.

## THE NOTE OFFERINGS BY DMP

*DMP Offers and Sells Notes Between 2007-2009 to
Fund the Acquisition of the Cemeteries*

24.     In addition to the $22 million investment from Westminster, Morrow sought approximately another $10 million, purportedly to make a successful bid to acquire the cemeteries.  Morrow and DMP asked Alleca to raise the additional money from Summit investment clients and authorized Alleca to sell promissory notes issued by DMP.

25.     From October-December 2007, Alleca and his advisors at Summit sold approximately $9.5 million worth of DMP promissory notes to approximately 99 clients of Summit.

26.     Once it became apparent that it would take longer to close the cemetery purchase than initially expected, Morrow transferred the proceeds from the initial note sales to an investment account and authorized Alleca to trade with the funds.

27.     Alleca lost more than $5 million of the note proceeds in risky, short-term equity trading in early January 2008.

28.     Morrow demanded that Alleca make up the losses.

29.     Alleca sold additional DMP promissory notes between January 23, 2008 and September 16, 2009, bringing in approximately $8.2 million in additional funding.

30.     The proceeds of the 2007-2009 note sales (the "Initial Offering") were deposited into a bank account exclusively controlled by Morrow.

31.     Morrow received copies of the subscription agreements and documentation related to each note purchaser during Initial Offering.

32.     Morrow was aware of and authorized the Initial Offering on behalf of DMP.

33.     A DMP private placement memorandum was circulated to investors in connection with the Initial Offering.

34.     While Alleca drafted this private placement memorandum on behalf of DMP, Morrow reviewed drafts of the document before it was finalized and distributed to potential investors.

35.     Morrow was the only individual with authority to authorize the offering and sale of the DMP notes.

36.     The private placement memorandum contained the following misrepresentations, among others:

a.      "The Notes . . . will be secured by real property and equity interest in 28 Michigan cemeteries."  In fact, no security interest was ever perfected or recorded with respect to the notes.  DMP had no real property or ownership interest in the cemeteries with which to secure the notes.

b.      "Independent of the amounts raised in this offering, [DMP] will, after completing the purchase transaction, have equity in real property and cemeteries and other assets available to use to pay principal or interest on the Notes."  In fact, DMP had no assets at all at the time of the Initial Offering.   Moreover, the private placement memorandum did not disclose that Westminster would have a preference to distributions from MMG's cemetery operations.

c.      "The Company is in the business of owning and managing cemeteries."  In fact, DMP never owned or managed any cemeteries.  It was merely a holding company owning a minority stake in MMG.

d.      "The senior management team has . . . more than 150 dedicated employees."  In fact, DMP had no employees.

e.      "The Company has recently purchased the assets of twenty eight cemeteries located throughout the state of Michigan."  In fact, at the

time of the Initial Offering, no cemetery properties had been purchased

by any entity affiliated with DMP.   Moreover, DMP never purchased

the assets of the cemeteries.  Instead, MMG bought those assets.

    f.     "The use of the proceeds will be to acquire and manage

cemeteries."  In fact, approximately $5.8 million of the proceeds from

the note offering were used to purchase Morrow's 39% equity share of

DMP; substantial proceeds were used were used for Alleca's high-risk

trading and a substantial amount of those funds were lost; and proceeds

from some note sales after December 2007 were used to make interest

payments to existing note holders.

37.    The Initial Offering was not registered with the Commission.

38.    Using funds from the Initial Note Offering, funds from the equity

investments described below and funds contributed by Westminster, MMG

purchased the cemeteries in the summer of 2008.

*The 2012 Note Offering*

39.    DMP offered a second round of notes in 2012 (the "2012 Offering")

shortly before many of the initial notes were due to mature.  Approximately $1.3

million in notes were sold to 18 investors in March 2012.

40.    Morrow knew of and authorized the 2012 Offering on behalf of DMP.

10

41.    DMP used a two page "Fact Sheet" in connection with the 2012 Offering.  The Fact Sheet stated that the funds raised would be used to retire DMP's debt.

42.    Proceeds of the 2012 Offering were deposited in the DMP bank account that was exclusively controlled by Morrow.

43.    Proceeds from the 2012 Offering were used to make redemptions of some prior note holders.

44.    The Fact Sheet misrepresented that DMP owned 28 cemeteries in the state of Michigan.  In fact, DMP only owned a minority interest in MMG, which was the actual owner of the cemeteries.

45.    The Fact Sheet failed to disclose that Westminster had a preference with regard to distributions from MMG's cemetery operations.

46.    The Fact Sheet stated, "Since acquired, DMP management has increased sales over 120%" and "DMP is excited about continuing operations."

47.    The Fact Sheet did not disclose that cemetery operations had not been profitable or that DMP and Westminster had been required to satisfy ongoing capital calls in order to fund operations.

## THE EQUITY INVESTMENTS

48.     In addition to the note offerings, DMP raised approximately $4.5 million from four investors in return for a combined equity interest of 61% in DMP.

49.     Morrow personally solicited at least some of the equity investments.

50.     Morrow misrepresented to some of the equity investors that DMP had no debt.  In fact, DMP had substantial debt given the note offerings.

51.     Morrow told the equity investors that he had personally borrowed a portion of the supposed $5.8 million shown as his "capital contribution."

52.     In fact, Morrow used the proceeds from the note offering to purchase his equity interest.  Morrow did not execute any form of note evidencing his "loan" from DMP.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

53.     Paragraphs 1 through 52 are hereby realleged and incorporated herein by reference.

54.     Between in or around 2007 and the present, the Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails,

directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

55.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

56.     While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

57.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

58.     Paragraphs 1 through 52 are hereby realleged and incorporated herein by reference.

59.     Between in or around 2007 and the present, the Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.     engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

60.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)]and Sections (a), (b), and (c) of Rule 10b-5
### thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)]

61.     Paragraphs 1 through 52 are hereby re-alleged and are incorporated herein by reference.

62.     Between in or around 2007 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

14

a.      employed devices, schemes, and artifices to defraud;

b.      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

63.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

64.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT IV – UNREGISTERED OFFERING SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a), 77e(c)]

65.     Paragraphs 1 through 52 are hereby realleged and are incorporated herein by reference.

66.     Defendants offered and sold securities during the Initial Offering.

67.     Defendants used interstate transportation, communication or mails in connection with the Initial Offering.

68.     At the time of the Initial Offering, no registration statement was in effect as to the securities offered and sold.

69.     The Initial Offering was not exempt from registration.

70.     By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully prays for:

### I.

A permanent injunction enjoining Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and sections (a), (b), and (c) of

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a),  (b), and (c)], Sections 17(a)(1),

17(a)(2),  and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.

§§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)], and Sections 5(a) and 5(c) of the Securities

Act [15 U.S.C. §§ 77e(a), 77e(c).

## II.

An order requiring disgorgement by Defendants of all ill-gotten gains or

unjust enrichment with prejudgment interest, to effect the remedial purposes of the

federal securities laws.

## III.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]

and  Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil

penalties against Defendants.

## IV.

Such other and further relief as this Court may deem just, equitable, and

appropriate in connection with the enforcement of the federal securities laws and

for the protection of investors.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial as to all issues so triable.

Dated:  May 30, 2013.

Respectfully submitted,

*/s/ Joshua A. Mayes*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov


Robert K. Gordon
Senior Trial Counsel
Georgia Bar No. 302482
gordonr@sec.gov

Joshua A. Mayes
Senior Trial Counsel
Georgia Bar No. 143107
mayesj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel:(404) 842-7600
Tel:(404)-842-7666