**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>               **Plaintiff,**<br><br>     **v.**<br><br>**DETROIT MEMORIAL PARTNERS, LLC and MARK MORROW,**<br><br>               **Defendants.** | **1:13-cv-1817-WSD** |

## OPINION AND ORDER

This matter is before the Court on Receiver Jason S. Alloy's ("DMP Receiver") Motion to Approve Plan of Distribution [166], as amended [169], [175], Claimant Leonard J. Walter's ("Walter") Objection to Receiver's Proposed Plan of Distribution [171], and Robert D. Terry's ("Terry" or "Summit Receiver") Objection to Receiver's Motion to Approve Plan of Distribution [172].

**I.     BACKGROUND**

**A.     Summit Scheme**

Plaintiff Securities and Exchange Commission (the "SEC") alleges that, in 2004, Angelo Alleca ("Alleca") formed Summit Investment Fund, LP ("SIF"), a

private fund for which he solicited investments from clients of his investment advisory firm, Summit Wealth Management, Inc ("Summit Wealth Management"). Complaint ¶ 2, S.E.C. v. Alleca et al., No. 1:12-cv-3261-WSD (N.D. Ga. Sept. 18, 2012) ("Alleca"), ECF No. 1.  Alleca misrepresented to investors that SIF operated as a "fund-of-funds" when, in fact, starting in 2006, he used the funds' assets to trade securities, incurring substantial losses.  Id. ¶ 2.

To cover the losses, Alleca started at least two additional funds, Asset Class Diversification Fund, LP ("ACDF") and Private Credit Opportunities Fund, LLC ("PCOF").  Id. ¶ 3.  He raised capital for the funds by selling interests in them to clients of Summit Wealth Management.  Id. ¶ 3.  Alleca used these proceeds to satisfy certain redemption requests made by SIF investors.  Id. ¶ 5.  ACDF and PCOF ultimately incurred losses.  Id. ¶ 3.

Summit Wealth Management concealed the losses from its advisory clients, including by issuing false account statements to approximately 200 of its clients. Id. ¶¶ 4, 23.  SIF, ACDF and PCOF (together, "Summit Funds") also used false account statements to conceal the losses from their investors.  Id. ¶ 4.  Alleca exercised control over Summit Wealth Management and the Summit Funds, and has dissipated most of the $17 million invested in the funds.  Id. ¶¶ 4, 6.

2

B.    Summit Receivership

On September 18, 2012, the SEC brought an enforcement action against Alleca, Summit Wealth Management, and the Summit Funds, alleging securities fraud. Alleca, [1]. On September 21, 2012, the Court appointed Robert D. Terry as receiver for the estate of Summit Wealth Management, SIF, ACDF and PCOF (together, "Summit Entities"). Alleca, [9] at 2. On November 21, 2012, the Court modified its September 21, 2012, Order to stay all litigation against the Receiver and the Summit Entities. Alleca, [27]. The Summit receivership has approximately $1.8 million in assets. ([172] at 2).

C.    DMP Scheme

The SEC alleges that, in September 2007, Defendant Mark Morrow ("Morrow") formed Defendant Detroit Memorial Partners, LLC ("DMP") to facilitate his attempted purchase of twenty-eight (28) Michigan cemeteries in receivership. (Compl. ¶ 16). Morrow owns a 39% membership interest in DMP and, from approximately 2007 to 2013, maintained operational control of the company. (Compl. ¶ 17).

William Belzberg ("Belzberg"), a businessman from California, agreed to invest $22 million in Morrow's acquisition of the cemeteries. (Compl. ¶ 20). To do so, Belzberg formed Westminster Memorial Group, LLC ("WMG"), which,

with DMP, formed Midwest Memorial Group, LLC ("MMG").  (Compl. ¶¶ 20-21).

DMP owned 49% of MMG, WMG owned 51%, and Morrow and Belzberg

intended that MMG would purchase the cemeteries.  (Compl. ¶ 21).  The MMG

operating agreement provided that WMG could recoup 100% of its $22 million

capital contribution before DMP received any distributions.  (Compl. ¶ 22).

To fund DMP's share of the MMG purchase, Morrow sought assistance

from Alleca, with whom he had a pre-existing relationship.  ([166] at 3; Compl.

¶ 13).  From October 2007 to December 2007, at Defendants' request, Alleca sold

approximately $9.5 million in promissory notes issued by DMP.  (Compl. ¶ 24-25;

[166] at 3).[1]  A DMP "private placement memorandum" was reviewed by Morrow

and circulated to investors in connection with these sales.  (Compl. ¶¶ 33-34).  The

memorandum contained several misrepresentations, including that DMP owned the

twenty-eight (28) cemeteries in Michigan, that the promissory notes would be

secured by those properties, and that the proceeds from the notes would be used to

acquire and manage cemeteries.  (Compl. ¶¶ 1, 36).  In fact, the notes were

unsecured and DMP had no assets with which to secure the notes.  ([166] at 3).

---

[1]     The notes were sold in $50,000 increments and purported to reflect debt
issued by DMP.  ([166] at 3).

In late 2007 or early 2008, Morrow transferred proceeds of the note sales to an investment account, and authorized Alleca to use the funds in equity trading. ([166] at 3; Compl. ¶ 26). In January 2008, Alleca lost more than $5 million in high-risk, short-term equity trades. ([166] at 3; Compl. ¶ 27). Between January 2008 and September 2009, Alleca, attempting to make up the losses, sold approximately $8.2 million in additional DMP promissory notes. (Compl. ¶¶ 28-29). The private placement memorandum was again presented to potential investors in connection with these sales. ([166] at 4). In the summer of 2008, MMG purchased the twenty-eight (28) Michigan cemeteries, using funds from WMG and from DMP's note sales. ([166] at 4).

In March 2012, Morrow authorized DMP to sell a second round of promissory notes to approximately sixteen (16) investors. (Compl. ¶¶ 39-40; [166] at 4). DMP issued a sales "Fact Sheet," which contained several misrepresentations, including that DMP owned the twenty-eight (28) Michigan cemeteries and that the funds raised would be used to retire DMP's debt. (Compl. ¶¶ 39-47). In fact, the proceeds of the 2012 offering were used for other purposes, including to redeem the notes of other note-holders. (Compl. ¶ 43; [166] at 4). The proceeds from all note sales, between 2007 and 2012, were deposited into a bank account controlled exclusively by Morrow. (Compl. ¶¶ 30, 42).

5

Following the 2012 offering, DMP sold a 61% equity interest in the company to four (4) or five (5) investors, for approximately $4.5 million. ([43.2] at 3; [166] at 4; Compl. ¶ 48). Morrow personally solicited at least some of these equity investments. (Compl. ¶ 49). Morrow misrepresented to the investors that DMP was debt-free and that he had personally borrowed the $5.8 million "capital contribution" he made to DMP. ([166] at 4; Compl. ¶¶ 50-51). In fact, Morrow had used proceeds from the note sales to fund his equity interest. ([166] at 4-5).

D.    DMP Receivership

On May 30, 2013, the SEC filed its Complaint [1], alleging that DMP and Morrow engaged in securities fraud. On August 14, 2013, "a majority of [DMP's] members" purported to file, on behalf of DMP, an answer and cross-claim against Morrow. ([12] at 1). Two days later, on August 16, 2013, DMP and Morrow filed their Answer and Defenses to Plaintiff's Complaint [15], raising a question over who controlled DMP for the purposes of this litigation. On August 20, 2013, after learning that DMP would imminently receive approximately $7.7 million from MMG's settlement of an unrelated lawsuit, the SEC filed an emergency motion seeking to freeze Defendants' assets. ([25]). On September 24, 2013, the SEC asked the Court to appoint a receiver for DMP in light of conflicting interests among DMP's members and management. ([43]). On November 22, 2013, the

6

Court froze Defendants' assets and appointed Jason S. Alloy as DMP's receiver. ([51]; [52]).

On January 6, 2014, the DMP Receiver obtained approximately $7.8 million from MMG's settlement of a lawsuit it filed against Smith Barney. ([166] at 5).[2] In March 2016, DMP and WMG sold their interests in MMG for a total of approximately $16 million, 49% of which was paid to DMP. ([166] at 8). The DMP receivership has approximately $13 million in cash to distribute. ([166] at 10). Almost all of this money was obtained from MMG's settlement of its lawsuit and DMP's sale of its interest in MMG.

On August 30, 2016, the DMP Receiver filed his Motion to Approve Plan of Distribution, proposing to use the "rising tide" method of allocating assets. Under this allocation method:

> [T]he Receiver will deduct the amount of a claimant's pre-receivership disbursements *after* calculating the claimant's pro rata share of any distribution. If the result is negative—meaning that the claimant has already received pre-receivership disbursements in excess of his or her calculated pro rata share of a distribution—that claimant will not participate in that distribution, although he or she may participate in later distributions. This method recognizes that

---

[2]   MMG alleged, in the lawsuit, that "Smith Barney permitted one of its financial consultants to orchestrate a scheme that resulted in the theft of over $60 million from the trusts of twenty-eight Michigan Cemeteries." ([22.2] at 5); see Midwest Memorial Group et al. v. Singer et al., No. 10-000025-CR (Ingham County Mich. Cir. Ct.).

> claimants have already recovered differing percentages of their investment, and seeks to achieve an equal total percentage recovery for all claimants.

([166] at 31); see Commodity Futures Trading Comm'n v. Equity Fin. Grp., Inc., No. 04-cv-1512, 2005 WL 2143975, at *24 (D.N.J. Sept. 2, 2005) (discussing the rising tide methodology).  "Ultimately, when the pre-receivership disbursements are factored in, each claimant will receive a return of [69.5%] of their total investment."  ([166] at 36; [175] at 2).  On September 16, 2016, and October 17, 2016, the DMP Receiver filed minor amendments to his proposed distribution plan.  ([175]).

       E.     <u>Walter's Objection to the DMP Receiver's Proposed Distribution Plan</u>

      On April 12, 2013, Walter brought a civil action, in the United States District Court for the Eastern District of Michigan, asserting a claim against DMP for breach of contract.  Complaint, Walter v. Detroit Memorial Partners LLC, No. 2:13-cv-11676-DPH-RSW (E.D. Mich. Apr. 12, 2013) ("Michigan Case" or "<u>Walter</u>"), ECF No. 1.  Walter alleged that DMP defaulted on the promissory notes, and sought to recover the principal amount, $200,000, due under the notes, plus $4,875 in unpaid interest.[3]  Walter had previously redeemed an additional

---

[3]     Walter purchased the notes through Summit Wealth Management.  <u>Walter</u>, [9] at 3.

$100,000 investment in DMP notes, and received approximately $90,000 in interest payments. ([166] at 21-22; [171] at 2; [180] at 6).

On June 5, 2013, Walter requested, and the clerk of court entered, default against DMP in the Michigan Case. Walter, [5], [6]. On June 21, 2013, Walter requested, and the clerk of court entered, default judgment against DMP. Walter, [7]; [8]. On August 29, 2013, Walter filed a motion in the Michigan Case, seeking a charging order, under Michigan state law, that would grant him a lien on DMP's membership interest in MMG. Walter, [9]. On September 11, 2013, the Michigan court summarily granted Walter's motion, ordering that DMP's "membership interest in Midwest Memorial Group, LLC shall be subject to a lien and charging order in favor of and for the benefit of [Walter] for payment of the default judgment . . . entered by the Court on June 21, 2013." Walter, [10]. The order stated that Walter "shall be deemed a lien creditor of [DMP]." Walter, [10]. There has been no other activity in the Michigan Case.

In February 2015, Walter notified the DMP Receiver that he held a lien on DMP's interest in MMG, and argued that he was entitled to full payment on his default judgment. ([171] at 4). The DMP Receiver replied that "the right time to raise the argument is after our proposed distribution plan." (Id.).

On August 30, 2016, the DMP Receiver filed his Motion to Approve Plan of

9

Distribution, proposing to "treat Mr. Walter's claim on par with all the other noteholder claimants."  ([166] at 52).  On October 5, 2016, Walter filed his Objection to Receiver's Proposed Plan of Distribution, arguing that the DMP Receiver impermissibly "seeks to disregard the charging order, which explicitly established Walter's status as lien creditor, and to relegate Walter to the position of an unsecured creditor."  ([171] at 1-2).  Walter claims that, as a lien creditor, his rights are "superior to all other claimants to the receivership estate" and that he is "entitled to have his judgment paid in full before general unsecured creditors are paid."  ([171] at 6).

On October 18, 2016, the DMP Receiver filed his Response to Objection of Claimant Leonard J. Walter to Receiver's Proposed Plan of Distribution [180]. The DMP Receiver argues that Walter's objection should be overruled because "DMP has not title to the assets upon which Mr. Walter has obtained a lien" and Walter should be treated the same as other similarly situated claimants.  ([180] at 7-12).

F.    Terry's Objection to the DMP Receiver's Proposed Distribution Plan

On November 13, 2014, Terry sent a letter to the DMP Receiver, asserting claims against the DMP receivership for approximately $7.3 million on behalf of PCOF and $210,000 on behalf of ACDF.  ([166] at 26-27).  Terry acknowledged

10

that these amounts did "not reflect any setoff for any amounts paid by DMP to Summit Investment Fund, L.P. . . . or Summit Wealth Management, Inc," and stated that "substantial transfers from DMP to SIF . . . will probably need to be accounted for." ([166.25]).  Terry did not provide documentation in support of his claims.  ([174.2] at 2).

On January 22, 2015, the DMP Receiver replied to Terry's letter, and identified two "very significant issues:"  "(1) that DMP paid more in the aggregate to Alleca-controlled entities and (2) that many investors in PCOF and ACDF likely filed individual claims in the DMP receivership, which would result in double recovery if their claims and the Summit entities' claims were accepted." ([174] at 6).  The DMP Receiver stated that he was inclined to recommend that the Court deny Terry's claims, but invited him to offer, by February 11, 2015, evidence in support of them.  ([174.2] at 2).

On July 8, 2016, the DMP Receiver wrote a letter to Terry, following up on their prior communications and stating that he still was inclined to recommend that Terry's claims be denied.  ([174.5]).  The letter provided Terry with "a final opportunity" to provide evidence in support of his claims.  ([174.5] at 1).

In a July 18, 2016, telephone conversation with the DMP Receiver, Terry offered a "high level" proposal that involved combining the receiverships.  ([174]

11

at 7-8).  The DMP Receiver asked Terry to send him the proposal in writing, so that he could review it carefully.  ([174] at 8).  He asked Terry to address several issues in the written proposal, including how to handle DMP claimants who were not involved with Summit Entities, double counting of other claims, and the fact that DMP sent more money to Alleca-controlled entities than it received.  (Id.).  Terry stated he would submit a proposal by July 22, 2016.  (Id.).

On July 29, 2016, Terry told the DMP Receiver that he would send him the proposal by August 1, 2016.  ([174] at 8).  On August 30, 2016, having received no proposal from Terry, the DMP Receiver filed his Motion to Approve Plan of Distribution.  More than a month later, on October 7, 2016, Terry filed his Objection to Approve Plan of Distribution.  Terry asks the Court to "order that the assets and claims of the [DMP and Summit] receiverships be pooled into one receivership" and that "the DMP Receiver be responsible for making distributions to claimants in both receiverships."  ([172] at 2).  Terry argues that "the Ponzi scheme activities and investment funds of DMP and those funds over which the Summit Receiver has been appointed receiver were so commingled and intertwined that separate administrations and distribution schemes would be inefficient and inequitable to many investors."  ([172] at 2).

On October 17, 2016, the SEC and DMP Receiver filed briefs in opposition

to Terry's objection.  ([174]; [179]).  The SEC and DMP Receiver argue that Terry's request is untimely and that combining the Summit and DMP receiverships is unwarranted, including because (1) there was not a unified fraudulent scheme among the entities in the receiverships, (2) the investors in each receivership are not similarly situated, and (3) funds were not commingled among the receivership entities.

On October 18, 2016, the Court held a hearing on the DMP Receiver's Motion to Approve Plan of Distribution and the objections filed by Walter and Terry.  ([181]).

## II.   LEGAL STANDARD

"In equity receiverships resulting from SEC enforcement actions, district courts have very broad powers and wide discretion to fashion remedies and determine to whom and how the assets of the Receivership Estate will be distributed."  S.E.C. v. Homeland Commc'ns Corp., No. 07-cv-80802, 2010 WL 2035326, at *2 (S.D. Fla. May 24, 2010); see S.E.C. v. Elliot, 953 F.2d 1560, 1566 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an equity receivership.  This discretion derives from the inherent powers of an equity court to fashion relief." (citations omitted)); see also Bendall v. Lancer Mgmt. Grp., LLC, 523 F. App'x 554, 557 (11th Cir. 2013)

("Any action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse." (citation and internal quotation marks omitted)).

"[N]o specific distribution scheme is mandated so long as the distribution is fair and equitable." Homeland, 2010 WL 2035326, at *2 (internal quotation marks omitted) (quoting S.E.C. v. P.B. Ventures, No. 90-cv-5322, 1991 WL 269982, at *2 (E.D. Pa. Dec. 11, 1991)). "[W]hen victims seeking restitution occupy similar positions, a pro rata distribution is preferred." S.E.C. v. Drucker, 318 F. Supp. 2d 1205, 1206 (N.D. Ga. 2004). "Thus, where a victim seeking preferential treatment cannot materially distinguish his situation from that of other victims, a pro rata distribution is recognized as the most equitable solution." Id. at 1207. A "rising tide" allocation, which the DMP Receiver proposes here, "result[s] in a pro rata distribution of available assets to victims." Michael L. Martinez, The Ebb of Rising-Tide Distributions in Ponzi Scheme Bankruptcies, 35 Am. Bankr. Inst. J. 16 (June 2016); see S.E.C. v. Par., No. 2:07-cv-00919, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010) (discussing "pro-rata payments based on the Rising Tide calculation").

## III.   DISCUSSION

A.   <u>Terry's Objection to the Proposed Distribution Plan</u>

Terry asks the Court to "order that the assets and claims of the [DMP and Summit] receiverships be pooled into one receivership." ([172] at 2). "[U]nable to find any cases" on the pooling of entities controlled by separate receivers, Terry relies on cases involving the pooling of entities controlled by a single receiver. (Transcript of Hearing on Receiver's Motion to Approve Plan of Distribution (Oct. 18, 2016) ("Tr.") at 4:12-13). Terry argues that "the rationale used by other courts in deciding to combine different entities under one receivership should be applied by analogy." ([172] at 13).

"[C]ourts may authorize the treatment of various receivership entities as one substantively pooled estate for the purpose of distribution, upon good cause shown." <u>S.E.C. v. Founding Partners Capital Mgmt.</u>, No. 2:09-cv-229, 2014 WL 2993780, at *6 (M.D. Fla. July 3, 2014). "Under the 'good cause' test for pooling [receivership entities], courts have examined a number of different factors, including whether: (1) a unified scheme to defraud existed among the receivership entities; (2) the investors across the various receivership entities are similarly situated; and (3) funds were commingled among the receivership entities." <u>Id.</u>; <u>see</u> <u>S.E.C. v. One Equity Corp.</u>, 2011 WL 1002702, *1 (S.D. Ohio Mar.16, 2011). In

15

considering whether assets in separate receiverships should be pooled—for which there is no authority—the Court considers, by analogy, the criteria developed for determining whether the assets of different entities within a single receivership should be pooled.

       1.    <u>Unified Scheme to Defraud</u>

The Court considers first whether there is here a unified scheme to defraud among the entities in the DMP and Summit receiverships.  The Court finds there is not.  Although the Summit and DMP schemes involved some overlapping persons, some transfer of funds between Summit and DMP entities, and the occurrence of some investment in DMP by a limited number of Summit investors, the two receiverships were not part of a unified scheme to defraud investors.

The SEC does not regard the conduct in the Summit and DMP cases as part of a single unified scheme.  The schemes were the subject of two separate civil actions brought by the SEC, supporting that "each of the schemes had its own salient features, characteristics, and facts."  ([179] at 4).  Each scheme had a different organizer and architect that focused on different "investment" objectives.  Alleca was the principal architect of the Summit scheme and obtained investments from victims based on his perceived capital markets prowess.  ([174] at 14-15).  Morrow was the principal architect of the DMP scheme, and focused on seeking

investors for real estate investments with notes purportedly secured by cemeteries. (Id.)  Alleca controlled the Summit Entities and lost investor money by engaging in high-risk securities trading.  Morrow controlled DMP and was the only person who knew the scheme involving DMP's business and operations.  (Id.).  Investor funds raised from the Summit scheme went to accounts controlled by Alleca, and investor funds raised from the DMP scheme went to accounts controlled by Morrow.  (Id.).  The schemes concocted for the Summit and DMP entities were not unified.

### 2.   Whether the DMP and Summit Investors are Similarly Situated

The Court next considers whether the investors in the DMP and Summit entities are similarly situated.  The evidence shows they are not.  The SEC, which brought separate actions against the DMP and Summit entities, does not believe that the investors in those entities are similarly situated.  ([179] at 5).  Many of the investors in Summit Entities—perhaps more than 70% of them—did not invest in DMP.  ([179] at 5; [172] at 10; see [174] at 11).  A significant percentage of the funds invested in DMP came from people who were neither clients of Summit Wealth Management nor investors in the Summit Funds.  ([179] at 5).  This includes funds obtained from DMP members who directly invested approximately $6.5 million in DMP.  ([174] at 12).  The investors in each scheme had different

17

expectations.  The Summit investors thought they were depositing money into funds that would build wealth through Alleca's investing prowess.  The DMP investors thought they were buying promissory notes secured by real estate.  ([179] at 5).  The Court finds the DMP and Summit investors are not similarly situated.[4]

### 3.   Whether Funds Among the Receivership Entities Were Commingled

The funds were not inextricably commingled among the DMP and Summit entities.  The DMP Receiver has identified, and accounted for, the monetary transactions between DMP and each Summit Entity.  ([174] at 9; Tr. at 17:6-7).  The transfers from DMP to Alleca-controlled entities exceed transfers from Alleca-entities to DMP.  ([174] at 15-16; [179] at 5).[5]  The DMP and Summit entities used separate bank accounts.  (Tr. at 9:21).  The DMP accounts were

---

[4]     At the October 18, 2016, hearing on the proposed distribution plan, the Summit Receiver agreed that there were "two different genres of investments in which two different kinds of investors with different expectations were duped." (Tr. at 8:3-6).

[5]     This includes funds transferred from DMP to Summit Capital Holdings, an Alleca-controlled entity that is not part of the Summit receivership.  ([174] at 5). What Summit Capital Holdings did with these funds is unclear.  Terry represents that "some of th[e] money was used for Alleca's own purposes, while some of it was used to re-pay investors."  ([172] at 15).  Terry states further that Summit Capital Holdings "was a conduit used to transfer money for Alleca's and Morrow's purposes."  (Id.).  Terry has not provided the Court, or the DMP Receiver, with a detailed accounting of the Summit receivership.  ([174] at 9-10, 16-17; Tr. at 16:19-17:1).

controlled by Morrow, and the Summit accounts were controlled by Alleca.  ([179] at 6).  Most of the business conducted by the Summit Entities did not involve DMP and, as a practical matter, commingling of their funds was not required.  ([174] at 13).  Although there were some transfers between the DMP and Summit entities, the funds were not inextricably commingled.  None of the above criteria, individually or together, support that the assets of these two receiverships should be pooled.

The timing of Terry's request for consolidation of the receiverships further supports that pooling is not appropriate or fair.  If pooling was allowed at this late stage, substantial costs, inefficiencies and unfairness would be imposed on investors.  On November 13, 2014, Terry sent a letter to the DMP Receiver, asserting claims against the DMP receivership.  Terry did not provide documentation in support of his claims, and he did not then propose combining the receiverships.  ([174] at 6).  On January 22, 2015, the DMP Receiver replied to Terry's letter, stating that he was inclined to recommend that the Court deny Terry's claims, but inviting him to offer evidence in support of them.  ([174] at 6; [174.2]).

From February 2015 through August 2016, the DMP receiver requested from Terry a variety of factual information to investigate Terry's contention of

overlap and unity in the schemes underlying the DMP and Summit entities.  It was not forthcoming.  Accordingly, on August 30, 2016, having received no proposal from Terry, the DMP Receiver filed his Motion to Approve Plan of Distribution. Just a few days before the Court's hearing on the proposed distribution plan, Terry filed his objection based on his pooling suggestion.

The Court understands that Terry is seeking to advance the interests of the Summit investors generally.  However, Terry's proposal to merge receiverships established years ago is materially different than the cases, cited by Terry, involving the pooling of entity assets controlled by a single receiver.  For this additional reason, Terry's objection to the proposed plan of distribution is overruled.[6]

B.    Walter's Objection to the Proposed Distribution Plan

Walter claims he is entitled to recover from the DMP receivership the full amount of his unpaid $200,000 notes because a Michigan district court granted him a default judgment and, later, a lien on DMP's interest in MMG.  The DMP

---

[6]    In his objection brief, Terry argued that, if the receivership entities are not pooled, his claims on behalf of ACDF and PCOF should be allowed.  ([172] at 14-16).  At the October 18, 2016, hearing, the Summit Receiver stated that this request would be moot if the "DMP claimant[s] that filed in our receivership also filed in [the DMP receivership]."  (Tr. at 33:1-2).  The DMP and Summit Receivers agreed to work together on this issue.  (Tr. at 32:13-34:2).

Receiver argues that Walter's claim should not be prioritized over other similarly situated note-holders.

1.    The Status of Liens in Equitable Receiverships

It is well-established that a "district court has broad powers and wide discretion to determine relief in an equity receivership." Elliot, 953 F.2d at 1566. "[I]n fashioning relief in an equity receivership, a district court has discretion to summarily reject formalistic arguments that would otherwise be available in a traditional lawsuit." Broadbent v. Advantage Software, Inc., 415 F. App'x 73, 78 (10th Cir. 2011); see Liberte Capital Grp., LLC v. Capwill, 148 F. App'x 426, 434 (6th Cir. 2005) ("[A] court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership."); United States v. Vanguard Inv. Co., 6 F.3d 222, 227 (4th Cir. 1993) ("[A] district court in its discretionary supervision of an equitable receivership may deny remedies like rescission and restitution where the equities of the situation suggest such a denial would be appropriate.").[7]

---

[7]    There has been some uncertainty about the scope of this principle.  The federal district court in Utah found, in a receivership case, that "courts in equity are bound by the law as much as courts of law" and "courts supervising receiverships cannot simply ignore applicable state and federal laws."  S.E.C. v. Mgmt. Sols., Inc., No. 2:11-cv-01165, 2013 WL 594738, at *3 (D. Utah Feb. 15, 2013).  In the Southern District of New York, the court found that its "equitable powers are

The tension between a court's requirement to do equity and respect property rights has been addressed, in general terms, by courts in the past.  The United States Supreme Court has said that "a receiver appointed by a federal court takes property subject to all liens, priorities, or privileges existing or accruing under the laws of the State."  Marshall v. New York, 254 U.S. 380, 385 (1920) (granting the state of New York a priority right to receivership assets, over unsecured creditors, because state law so required); see also Cates v. Musgrove Petroleum Corp., 376 P.2d 819, 821 (Kan. 1962).  The Supreme Court later said, in Ticonic Nat. Bank v. Sprague, 303 U.S. 406 (1938), that "to the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution."  Id. at 412 (finding that the holder of a pre-receivership lien, granted by the Federal Reserve Act, had priority over general creditors).

The Utah district court applied these principles in In re Real Prop. Located at Redacted Jupiter Drive, Salt Lake City, Utah, No. 2:05-cv-1013, 2007 WL

insufficient to set aside otherwise valid 'at law' claims," S.E.C. v. Credit Bancorp., Ltd., 279 F. Supp. 2d 247, 260 (S.D.N.Y. 2003), and that its "equitable authority . . . does not extend to abrogating property rights created by state law and protected by due process; equity follows the law," S.E.C. v. Haligiannis, 608 F. Supp. 2d 444, 449 (S.D.N.Y. 2009); cf. Matter of Merchants Grain, Inc. By & Through Mahern, 93 F.3d 1347, 1352 (7th Cir. 1996) ("A lien is a property right.").

7652297 (D. Utah Sept. 4, 2007), where a receivership had been created over two parcels of land that were involved in a failed real estate investment scheme.  There were two classes of claimants in the case:  individuals who made unsecured loans to the developer, and institutions that made loans properly secured by the real estate.  Id. at *2.  In framing the issue to be decided, the court stated:

> The legal question is whether a pro rata distribution treating all claims as equivalent is appropriate where both secured and unsecured claims are presented.  Although a court administering an equity receivership has discretion in the distribution of the assets, the general rule is that a court should respect lien priorities created under state law.  Under Utah law, it is clear that secured creditors have priority over unsecured, and that among secured creditors, the date of perfection determines relative priorities.

Id. at *3.  The court rejected the receiver's proposed pro rata distribution, finding that "lien priorities [were] to be respected" in the distribution because "[s]tate lien priority law is not an 'equitable remedy' of a creditor, but a legal status."  Id. at *4.  The court reached this conclusion, even though it meant that unsecured investors were "very unlikely [to] receive any money."  Id. at *2. See also Mgmt. Sols., 2013 WL 594738, at *4 (stating that although the court had "broad powers to craft an equitable remedy in the distribution of the receivership assets. . . .[,] it cannot ignore state and federal laws" and "must respect contract rights, the status of secured creditors, and secured creditors' rights to their interests in collateral")

Cases in this area focus on identifying the specific property interest held by the creditor and the date on which it attached.  In S.E.C. v. Ferona, No. 05-cv-00621, 2008 WL 4964675 (D. Colo. Nov. 18, 2008), a court-appointed trustee took control of, and sold, real estate that defendants had purchased with the proceeds of a Ponzi scheme.  The principal issue was whether creditors with a judgment lien in the property had a priority right, over unsecured investors, to the proceeds of the sale.  The court found that state law determines the nature of a state judgment lien and that the lien-holders were entitled to priority payment because they obtained their lien before the court took exclusive jurisdiction and possession of the property.  Id. at *2-3; see also S.E.C. v. Levine, 881 F.2d 1165 (2d Cir. 1989) (finding that the IRS, whose statutory lien attached prior to the disgorgement, was entitled to priority payment from the disgorged assets held by the receiver).

The question here is whether Walter's charging order gave him a pre-receivership lien in property now held by the DMP Receiver.[8]

---

[8]   The DMP Receiver has not cited, and the Court has not found, any case in which a pre-receivership lien-holder did not receive priority in a receiver's distribution of assets.  See In re Real Prop., 2007 WL 7652297, at *4 ("The Special Master is not aware of any court that has explicitly held that the priority of liens as established by state law can be ignored simply because a receivership is in place."); see also Credit Bancorp, Ltd., 279 F. Supp. 2d at 261 ("The Court has discovered no instance in which a court applying the law of federal equity receivership has rejected a valid 'at-law' claim in favor of an equitable claim.").

2.    <u>Walter's Charging Order</u>

On "application from any judgment creditor of a member of a limited liability" a Michigan court "may charge the membership interest of the member with payment of the unsatisfied amount of judgment with interest."  Mich. Comp. Laws § 450.4507(1).  This "charging order" creates "a lien on the membership interest of the member" and, in Michigan, is the "the exclusive remedy by which a judgment creditor of a member may satisfy judgment out of the member's membership interest in a limited liability company."  Mich. Comp. Laws § 450.4507(5)-(6); <u>see</u> <u>BR N. 223, LLC v. Glieberman</u>, No. 13-mc-50297, 2013 WL 4832945, at *3 (E.D. Mich. Sept. 10, 2013) ("[A] charging order is a *lien*

---

The DMP Receiver cites <u>S.E.C. v. Amerindo Inv. Advisors Inc.</u>, No. 05-cv-5231, 2014 WL 2112032, at *16 (S.D.N.Y. May 6, 2014), but that case addressed the status of judgment creditors, not the status of judgment creditors with a lien or other secured interest in property.  The DMP Receiver also cites <u>U.S. S.E.C. v. Quan</u>, No. 11-cv-723, 2013 WL 1703499 (D. Minn. Apr. 19, 2013), where, before a distribution plan was proposed, the court said it had "broad authority to approve a distribution plan that is governed by equitable principles rather than . . . operating documents and other legal rules governing priority."  <u>Id.</u> at *5.  However, when a distribution plan was later proposed in that case, the court found that a bank's "secured claim of $5,843,267 should have priority over other claims," including because a receiver takes property subject to all pre-existing liens and "[c]ourts often recognize the preferential rights of secured creditors." <u>U.S. Sec. & Exch. Comm'n v. Quan</u>, No. 11-cv-723, 2015 WL 8328050, at *7 (D. Minn. Dec. 8, 2015).

*against an interest* such that the interest could not be collected by Defendants or some other creditor.").

A charging order is often viewed as a distinctive or limited lien because it only gives the creditor "the right to receive any distributions that the member is entitled to or becomes entitled to in the future." In re Dzierzawski, 528 B.R. 397, 409 (Bankr. E.D. Mich. 2015); see Mich. Comp. Laws § 450.4507(2). "If neither the LLC's operating agreement nor its members authorize nonliquidating distributions from the LLC, the charging order may be worthless to the judgment creditor." Susan Kalinka, Assignment of an Interest in A Limited Liability Company and the Assignment of Income, 64 U. Cin. L. Rev. 443, 483 (1996).

The charging order does not make the lien-holder a member of the limited liability company ("LLC"), does not allow him to foreclose on the lien, is not an assignment of the debtor's membership interest, and does not deprive any LLC member of the benefit of any exemption laws. Mich. Comp. Laws § 450.4507(2)-(5). The charging order also does not permit the lien-holder to require the LLC to "take an action, provide an accounting, or answer an inquiry." Mich. Comp. Laws § 450.4507(6). These limitations are intended to prevent a creditor who has a claim against a member, but not against the LLC, from disrupting the LLC's business or seizing LLC property to the detriment of

26

non-debtor members.  See Susan Kalinka, Assignment of an Interest in A Limited

Liability Company and the Assignment of Income, 64 U. Cin. L. Rev. 443, 489

(1996).

"The charging order, then, constitutes a lien on the debtor's right to

distributions, and it stays attached thereto until the judgment is satisfied," but it

does not affect the debtor's other membership rights or the rights of the non-debtor

members of the LLC.  Chad J. Pomeroy, Think Twice: Charging Orders and

Creditor Property Rights, 102 Ky. L.J. 705, 712 (2014); see Jay D. Adkisson et al.,

Recent Developments in Charging Orders, Bus. L. Today 1 (Feb. 2013)

("Essentially, the charging order is a lien attaching to any distributions that might

be made to the member or assignee that is as well the judgment-debtor.").

On June 21, 2013, a Michigan federal district clerk of court entered default

judgment against DMP, in the amount of $204,875 plus interest, based on a

complaint Walter filed alleging breach of contract by DMP for failure to pay his

notes.  Walter, [7]; [8].  On September 11, 2013, the Michigan district court

entered its charging order, under Michigan state law, granting Walter a lien on

DMP's membership interest in MMG.  See Fed. R. Civ. P. 69(a)(1) ("The

procedure on execution—and in proceedings supplementary to and in aid of

judgment or execution—must accord with the procedure of the state where the

court is located.").  Two months later, on November 22, 2013, the Court froze Defendants' assets, appointed the DMP Receiver, and granted him "custody, control and possession of all [DMP] property."  ([51] at 3; see [52]).

On January 6, 2014, DMP received its "distributive share" of the proceeds of MMG's settlement of a lawsuit it filed against Smith Barney.  ([166] at 5; see [22] ¶¶ 11-12, 14; [39]; [41]; [52] at 2-3).[9]  This payment from MMG amounted to approximately $7.8 million, and constituted a "distribution" to which Walter was entitled, by virtue of his pre-receivership lien, to satisfy his default judgment. (Id.); see Mich. Comp. Laws § 450.4102(g) ("'Distribution' means a direct or indirect transfer of money or other property or the incurrence of indebtedness by a limited liability company to or for the benefit of its members or assignees of its members in respect of the members' membership interests.").  Walter's default judgment was entered on June 21, 2013, and is in the amount of $204,875 "plus interest."  Walter, [8].  Walter's lien thus entitles him to $204,875 plus $121.02 in total interest accruing from June 21, 2013 through November 21, 2013.  The Court finds that Walter is not entitled to later-accruing interest because, on November 22, 2013, the Court froze Defendants' assets and appointed the DMP

---

[9]    MMG's settlement agreement contains a confidentiality provision and has not been filed in this case.  ([39] at 2).  The SEC has, however, filed, under seal, a document showing the amounts distributed under the settlement.  ([41]).

28

Receiver, thus prohibiting distributions from DMP.  The total amount, including

interest, to which Walter is entitled is $204,996.02.[10]

Walter holds a pre-receivership lien interest in the approximately

$7.8 million of settlement funds in the DMP receivership.[11]  It appears that Walter

_____

[10]   "[I]n awarding postjudgment interest in a diversity case, a district court will
apply the federal interest statute, 28 U.S.C. § 1961, rather than the state interest
statute."  Ins. Co. of North America v. Lexow, 937 F.2d 569, 572 n. 4 (11th Cir.
1991); see Allstate Ins. Co. v. Palterovich, 653 F. Supp. 2d 1306, 1332 (S.D. Fla.
2009) ("The methodology for calculating the postjudgment interest rates for the
state law claims follows the federal standard.").  The federal statute provides that
post-judgment interest "shall be computed daily" and "shall be calculated from the
date of the entry of the judgment, at a rate equal to the weekly average 1-year
constant maturity Treasury yield, as published by the Board of Governors of the
Federal Reserve System, for the calendar week preceding. [sic] the date of the
judgment."  28 U.S.C. § 1961(a).  The applicable interest rate here is 0.14% or
approximately $0.79 per day, and the total interest accruing on Walter's judgment,
from June 21, 2013 through November 21, 2013, is $121.02 (($204,875 judgment
amount) x (0.14% treasury yield) / (365 days) x (154 days) = $121.02).  See
Wilson v. Liberty Mut. Ins. Co., No. 15-cv-1416, 2016 WL 3748551, at *13 n.17
(W.D. La. July 8, 2016) (stating that daily interest = (judgment amount) x
(applicable Treasury yield) / 365 days)).

[11]   The DMP Receiver briefly argues that "DMP has no title to the assets upon
which Mr. Walter has obtained a lien" because DMP obtained those assets through
fraud.  ([180] at 7).  The DMP Receiver does not otherwise dispute that Walter
holds a valid lien on property in the DMP receivership.  The DMP Receiver relies
on First Nat. Bank of Cartersville v. Hill, 412 F.Supp. 422 (N.D. Ga. 1976), where
the court held that "no title is acquired by an embezzler [and] that such title
remains in the victim."  Id. at 425.  The present case concerns securities fraud, not
embezzlement.  "[A] perpetrator of securities fraud has a voidable property interest
in the proceeds of the illegal transaction to which a creditor's lien can attach."
S.E.C. v. Pinez, 989 F. Supp. 325, 339 (D. Mass. 1997).  The DMP Receiver does
not argue that Walter's lien did not attach to property to which DMP held a

is the only claimant with a secured interest in DMP's receivership estate and his lien thus gives him priority over other claimants.  (See [166] at 52 ("Other than the claim asserted by Mr. Walter, the Receiver is not aware of any other claims regarding receivership property asserted outside the receivership.")).[12]  As a result, the DMP Receiver must distribute to Walter $204,996.02 from the funds received in the MMG-Smith Barney settlement.  Cf. Ferona, 2008 WL 4964675, at *3 ("Intervenor held a judgment lien against the property which had to be satisfied . . . before any amounts were payable to [the SEC] for the benefit of other victims of Defendants' fraudulent activities.").

C.   Reasonableness of the DMP Receiver's Proposed Plan of Distribution as Adjusted by this Opinion and Order

The Court has broad discretion to approve any distribution plan that is reasonable and equitable.  See S.E.C. v. Wang, 944 F.2d 80, 88 (2d Cir. 1991) ("The district court's task is to decide whether, in the aggregate, the plan is equitable and reasonable."); S.E.C. v. AmeriFirst Funding, Inc., No. 3:07-cv-1188,

voidable title.  Further, there has been no adjudication or admission of DMP's liability for the securities violations alleged in the Complaint.  It is therefore impermissible to assume that DMP fraudulently obtained assets to which a lien could not attach.  Levine, 881 F.2d at 1174-75.

[12]   Walter has asserted, and the DMP Receiver has not disputed, that "there are no other liens against or security interests in DMP's membership interest in MMG."  ([171] at 13).  Walter's pre-receivership lien gives him priority over general unsecured creditors.

2008 WL 919546, at *3 (N.D. Tex. Mar. 13, 2008) ("A district court has wide latitude when it exercises its inherent equitable power in approving a distribution plan of receivership funds.").  "A distribution plan that is supported by both the SEC and the receiver is entitled to deference from the Court."  Quan, 2015 WL 8328050, at *6; see S.E.C. v. Byers, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) (giving deference to a distribution plan proposed by the receiver and supported by the SEC).

As explained earlier in this Opinion and Order, the DMP Receiver proposes to use the "rising tide" method of distributing assets.  The SEC does not object to this proposed distribution method.  (See [166] at 1 n.1).  "The basic goal [of the rising tide allocation] is to equalize recovery for victims regardless of whether the recovery comes before or after the commencement of the [receivership]."  Michael L. Martinez, The Ebb of Rising-Tide Distributions in Ponzi Scheme Bankruptcies, 35 Am. Bankr. Inst. J. 16 (June 2016).  "Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets."  S.E.C. v. Huber, 702 F.3d 903, 906 (7th Cir. 2012).  Having reviewed the DMP Receiver's distribution proposal, the Court finds that, subject to the Court's ruling on Walter's objection, the proposed plan of distribution is fair and equitable.

IV.   **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Receiver Jason S. Alloy's Motion to

Approve Plan of Distribution [166], as amended [169], [175], is **GRANTED**,

provided, however, that consistent with this Opinion and Order, Claimant

Leonard J. Walter is given a distribution in the total amount of $204,996.02, with

the balance of the assets to be distributed to other claimants pro rata according to

the plan.

**IT IS FURTHER ORDERED** that Receiver Jason S. Alloy shall file, on or

before November 30, 2016, a revised distribution plan chart showing the amount to

be paid to Claimant Leonard J. Walter and the distribution amounts to all other

claimants.[13]  This chart shall be approved by the Court before any funds are

distributed.

**IT IS FURTHER ORDERED** that Claimant Leonard J. Walter's Objection

to Receiver's Proposed Plan of Distribution [171] is **SUSTAINED**.

**IT IS FURTHER ORDERED** that Robert D. Terry's Objection to

Receiver's Motion to Approve Plan of Distribution [172] is **OVERRULED**.

---

[13]     The DMP Receiver's current distribution chart is located at docket
entry [175.1].

**SO ORDERED** this 8th day of November, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE