IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | CIVIL ACTION FILE |
| v. | NO. 1:13-CV-1817-MHC |
| DETROIT MEMORIAL PARTNERS, LLC; MARK MORROW, | |
| Defendants. | |

## FINAL ORDER AND JUDGMENT

This case comes before the Court on Plaintiff U.S. Securities and Exchange

Commission (the "Commission")'s Motion for Summary Judgment, a Permanent

Injunction and Monetary Relief against Defendant Mark Morrow (the "Motion"),

filed on December 21, 2016.[1] Mot. for Summ. J. [Doc. 189].

---

[1] This case was reassigned to the undersigned on July 3, 2018.

## I.     BACKGROUND

### A.     Procedural History

On May 30, 2013, the Commission filed a Complaint alleging that Defendants defrauded investors out of at least $19 million through note offerings that contained false or misleading information.  Compl. [Doc. 1].  The Complaint alleges violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act of 1934, and Rule 10b-5.  Id.  The Complaint seeks permanent injunctive relief, an accounting, disgorgement plus prejudgment interest, and civil penalties.  Id.  On November 22, 2013, the Court (1) ordered that certain assets of Defendants be frozen, and (2) appointed Jason S. Alloy as the Receiver (the "Receiver") for the estates of Defendant Detroit Memorial Partners, LLC ("DMP").  [Docs. 51 & 52].  On December 15, 2015, Defendant Mark Morrow ("Morrow") was indicted in this district for essentially the same misconduct as alleged in the Complaint.  Criminal Indictment, United States of Am. v. Angelo Alleca and Mark Morrow, No. 1:15-CR-458-LLM-AJB (N.D.Ga. Dec. 15, 2015), ECF No. 1.  On November 10, 2016, the Court authorized the Receiver to distribute receivership assets to the claimants.  [Doc. 185].

On January 10, 2017, Morrow filed a motion to stay the proceedings pending the outcome of the criminal case against him. [Doc. 190]. On March 16, 2017, the Court granted Morrow's Motion to Stay.[2] [Doc. 197]. On November 8, 2017, Morrow pleaded guilty and was sentenced to serve 66 months in prison, three years of supervised release, and to pay restitution of $7,194,045.27. Am. J. in a Criminal Case, United States of Am. v. Angelo Alleca and Mark Morrow, No. 1:15-CR-458-LLM-AJB (N.D.Ga. Dec. 15, 2015), ECF No. 91. Morrow did not appeal his sentence. On March 8, 2018, the Commission filed a motion to lift the stay. [Doc. 212]. On April 4, 2018, the Court granted the motion to lift the stay, and ordered Morrow to respond to the Motion for Summary Judgment by May 10, 2018. [Doc. 215]. Morrow has not responded to the Motion.

## B.    Factual Background[3]

Defendant Mark Morrow resides in Cincinnati, Ohio, and has held a number of securities licenses, including series 7, 9, 26 and 42 licenses. SUF ¶ 1. Morrow has been in the securities industry since 1987, and he was associated with Landmark

---

[2] The stay did not affect the work of the Receiver.

[3] These facts are drawn from the Statement of Undisputed Facts submitted by the Commission ("SUF") in conjunction with its Motion for Summary Judgment, [Doc. 189-2] and are deemed admitted because Morrow failed to controvert them. See LR 56.1B(2)(a)(2), NDGa.

3

Investment Group, a registered broker dealer, from 1999 to October 2012. Id. ¶ 2. In 2007, Morrow incorporated DMP as a Delaware limited liability company in order to pursue the acquisition of cemeteries in Michigan. Id. ¶ 3. At all times relevant to the claims in the Complaint [Doc. 1], Morrow was the managing member of DMP and maintained complete operational control over DMP. Id. ¶¶ 4-5.

Morrow recruited David Shipper to be an equity holder in DMP, initially giving him 50% of DMP, but later promising him a 47% share in DMP in exchange for $1.5 million and Shipper's agreement to manage the cemeteries after they were acquired. Id. ¶ 6. Morrow convinced a wealthy businessman to invest approximately $22 million to be used towards the acquisition of the Michigan cemeteries. Id. ¶ 7. DMP and an entity owned by the businessman named Westminster Memorial Group ("Westminster") formed Midwest Memorial Group, LLC ("MMG") to be the actual purchaser of the cemeteries; DMP owned 49% of MMG and Westminster owned 51%. Id. ¶ 8. The MMG operating agreement contains a "waterfall" provision with respect to MMG distributions of profit that gives Westminster certain preferences over DMP, including the right of Westminster to recoup 100% of its capital contribution before DMP was entitled to any distributions. Id. ¶ 9.

In addition to the $22 million investment from Westminster, Morrow needed approximately $10 million to make a successful bid to acquire the cemeteries. Id. ¶ 10. Morrow authorized Angelo Alleca to offer promissory notes issued by DMP to raise the additional money. Id. ¶ 11. From October-December 2007, Alleca and his advisors at Summit Wealth Management, Inc. ("Summit") sold approximately $9.5 million worth of DMP promissory notes to approximately 99 clients of Summit. Id. ¶ 12. DMP issued and sold the promissory notes in order to fund its purchase of an interest in MMG, which would, in turn, purchase 28 cemeteries from a Michigan conservatorship. Id. ¶ 13. Morrow authorized DMP's note sales and reviewed drafts of the placement memorandum that was used to sell the notes. Id. ¶ 14.

The placement memorandum stated that "[t]he Notes . . . will be secured by real property and equity interest in 28 Michigan cemeteries," and that DMP "recently purchased the assets of twenty eight cemeteries located throughout the state of Michigan." Id. ¶ 15. The placement memorandum also stated that "[i]ndependent of the amounts raised in th[e Note] offering, [DMP] will, after completing the purchase transaction, have equity in real property and cemeteries and other assets available to use to pay principal or interest on the Notes." Id. ¶ 16. The placement memorandum further stated that DMP "is in the business of owning and managing cemeteries." Id. ¶ 17.

These statements were all false when they were made. Id. ¶ 18. In fact, the Notes were never secured, DMP had no assets at all when the Notes were first sold, and DMP never even planned to own any cemeteries. Id. ¶ 19. Even MMG did not own any cemeteries when Morrow authorized the sale of notes under the private placement memorandum. Id. ¶ 20. No registration statement was ever filed with the Commission with respect to DMP's offering of promissory notes. Id. ¶ 21.

Morrow, with the help of Angelo Alleca, also recruited several other equity investors, who contributed another $3 million to DMP. Id. ¶ 22. In connection with those investments, Morrow circulated a DMP operating agreement, dated March 1, 2008, which set forth the revised equity shares of each investor. Id. ¶ 23. The March 1, 2008 operating agreement lists Morrow as the sole managing member of DMP. Id. ¶ 24. Morrow did not tell the equity investors about the promissory note offering, claiming instead that he had borrowed the money personally. Id. ¶ 25.

DMP authorized Alleca to sell a second round of promissory notes in 2012, shortly before many of the initial notes were due to mature. Id. ¶ 26. Morrow knew of and authorized the 2012 Offering. Id. ¶ 27. DMP used a two page "Fact Sheet" in connection with the 2012 Offering; the Fact Sheet stated that the funds raised would be used to retire DMP's debt. Id. ¶¶ 28-29. The funds that were raised in the second round of note offerings were used to make redemptions of some prior note holders.

6

Id. ¶ 30. The Fact Sheet failed to disclose that Westminster had a preference with regard to distributions from MMG's cemetery operations. Id. ¶ 31. The Fact Sheet stated, "[s]ince acquired, DMP management has increased sales over 120%" and "DMP is excited about continuing operations." Id. ¶ 32. The Fact Sheet did not disclose that cemetery operations had not been profitable or that DMP and Westminster had been required to satisfy ongoing capital calls in order to fund operations. Id. ¶ 33.

Over the course of the past several years, the Receiver has marshaled and liquidated the assets of DMP. SUF ¶ 35. The Receiver has collected $12,808,121.01 that is available for distribution to investors, and $5,974,262.40 had been distributed to investors by DMP before the receivership, for a net return to investors of $18,782,383.41. [Doc. 166-1.] DMP's debt and equity investors collectively invested $26,755,800.30 in DMP. Id. Consequently, the net amount of investor losses resulting from Morrow's fraud is $7,973,413.89. SUF ¶ 38. The total pre-judgment interest on $7,973,413.89, starting from February 1, 2013, at the statutory rate for delinquent federal debts is $1,056,843.60. Id. ¶ 39.

## II.   LEGAL STANDARD

A court has the power to grant an unopposed motion for summary judgment pursuant to its local rules provided that the non-movant is put on notice that failing

to respond to the motion could result in the Court granting the motion for summary judgment as unopposed.  See <u>Dunlap v. TransAmerica Occidental Life Ins. Co.</u>, 858 F.2d 629, 632 (11th Cir. 1988).  The Eleventh Circuit has ruled that granting summary judgment in such a manner is appropriate "so long as the party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted." <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1204 (11th Cir. 1999).

In this case, Morrow was given ample notice that if he did not respond to the Commission's motion for summary judgment within the allotted time frame, the Court could deem the Commission's Motion unopposed.  The Local Rules put Morrow on notice that failure to respond could result in the Motion being considered unopposed.  Local Rule 7.1 dictates that failure to respond to a motion within the applicable time period "shall indicate that there is no opposition to the motion." LR 7.1(B), NDGa.  Moreover, pursuant to Local Rule 56.1, as discussed above, the factual allegations within the Commission's SUF are deemed admitted because Morrow failed to controvert them.  See LR 56.1B(2)(a)(2), NDGa. Morrow failed to file any response to the motion within the time period set by the

8

Court, as required by Local Rule 7.1(B). In fact, over two months have passed since the deadline set by the Court.

Despite the existence of an uncontested Motion for Summary Judgment supported by facts that are now deemed uncontroverted, the Court will consider the merits of the Commission's Motion. See United States v. 5800 SW 74th Ave., 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."). This is because Federal Civil Procedure Rule 56(e) provides that where "the adverse party does not respond, summary judgment, *if appropriate*, shall be entered against the adverse party." Id. (emphasis added).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment has the burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the movant is entitled to summary judgment unless there is a genuine issue of material fact or it is otherwise apparent from the record that the movant is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party.  Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles.  Anderson, 477 U.S. at 248.  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Id.

"If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

10

non-moving party," summary judgment for the moving party is proper. <u>Matsushita</u>

<u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

### A.   Liability

The Complaint contains four causes of action against Morrow.  The

Complaint alleges that Morrow violated Subsections 17(a)(1), 17(a)(2) and

17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rule

10b-5 as Counts I, II, and III.  Compl. ¶¶ 53-64.  "To establish a violation of

Section 10(b) and Rule 10b-5, the SEC must prove by a preponderance of the

evidence that Defendants made (1) material misrepresentations or materially

misleading omissions, (2) in connection with the purchase or sale of securities, and

that they (3) made them with scienter." <u>Sec. & Exch. Comm'n v. Torchia</u>, 183 F.

Supp. 3d 1291, 1310-11 (N.D. Ga. 2016) (quotations omitted, alterations accepted)

(citing <u>Sec. & Exch. Comm'n v. Merchant Capital, LLC</u>, 483 F.3d 747, 766 & n.17

(11th Cir. 2007)).  "Proof of a violation of Section 17(a)(1) through (3) requires

essentially the same elements in connection with the offer or sale of a security,

except that proof of scienter is not required for the SEC to seek an injunction under

Section 17(a)(2) or (3)." <u>Id.</u> (quotations omitted, alterations accepted) (citing <u>Sec.</u>

<u>& Exch. Comm'n v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999)).

The Commission's Statement of Undisputed Facts, admitted through Morrow's failure to respond, establishes each of these elements.

The Complaint also alleges that Morrow violated Sections 5(a) and 5(c) of the Securities Act.  Compl. ¶¶ 65-70.  "In order to establish a prima facie case for a violation of § 5 of the Securities Act, the SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect."  Sec. & Exch. Comm'n v. Big Apple Consulting USA, Inc., 783 F.3d 786, 806-807 (11th Cir. 2015).  The Commission's Statement of Undisputed Facts, admitted through Morrow's failure to respond, establishes each of these elements.  Accordingly, the Commission is entitled to summary judgment on Counts I-IV.

### B.    Civil Penalty

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the SEC to seek and the court to impose civil monetary penalties "[w]henever it shall appear to the Commission that any person has violated any provision of" the Securities Act or Exchange Act.  15 U.S.C. § 78u(d)(3)(A); 15 U.S.C. § 77t(d).  Both the Securities Act and Exchange Act have a three-tier range of maximum penalties that the district courts can impose, but the actual "amount of

the penalty shall be determined by the court in light of the facts and circumstances [of the particular case]." 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2)(A). First-tier penalties for each violation of the Securities Act and Exchange Act carry with them a maximum penalty of the larger of the amount of ill-gotten gain or $7,500.  15 U.S.C. § 78u(d)(3)(B)(i); 15 U.S.C. § 77t(d)(2)(A).[4]  If the violation of the Exchange Act or Securities Act involves fraud, tier two penalties are available for the larger of the amount of ill-gotten gain or $75,000.  15 U.S.C. § 78u(d)(3)(B)(ii); 15 U.S.C. § 77t(d)(2)(B).  Third-tier penalties apply when a defendant's conduct "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 77t(d)(2)(C).  Under the third tier, the court may impose a penalty not to exceed the greater of $150,000 for each violation or the gross amount of pecuniary gain to the defendant as a result of the violation.  Id.  "Though the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of the district

---

[4] See 17 CFR 201.1003, Table I (providing the adjustment of the civil penalties for inflation).  Table I provides different amounts for different dates of violations. Morrow's conduct began in 2007 and continued through 2012.

court." <u>Sec. & Exch. Comm'n v. Tourre</u>, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014).

"In determining whether to award civil penalties, courts consider numerous factors,

including the egregiousness of the violation, the isolated or repeated nature of the

violations, the degree of scienter involved, whether the defendant concealed his

trading, and the deterrent effect given the defendant's financial worth." <u>Sec. &</u>

<u>Exch. Comm'n v. Miller</u>, 744 F. Supp. 2d 1325, 1344 (N.D. Ga. 2010) (citing <u>Sec.</u>

<u>& Exch. Comm'n v. Sargent</u>, 329 F.3d 34, 42 (1st Cir. 2003)).

The Court finds that Morrow's behavior falls into the Third Tier as it

"involved fraud, deceit, manipulation, or deliberate or reckless disregard of a

regulatory requirement," and the violation "directly or indirectly resulted in

substantial losses or created a significant risk of substantial losses to other

persons."  The Court further weighs the following facts: (1) the evidence that over

100 people were harmed by Morrow's fraud, which totaled investments of almost

$27 million, and (2) the net losses to investors of almost $8 million.  Although the

parties did not present any evidence of Morrow's financial condition, the Court

notes that Morrow filed a sworn Financial Affidavit in the criminal case that

indicates a minimal net worth.  <u>See</u> Financial Aff., <u>United States of Am. v. Angelo</u>

<u>Alleca and Mark Morrow</u>, No. 1:15-CR-458-LLM-AJB (N.D. Ga. Jan. 19, 2016),

14

ECF No. 10.  The Court concludes that a $1,000,000 civil penalty will acknowledge the seriousness of his crime and also serve as a sufficient deterrent.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff U.S. Securities and Exchange Commission's Motion for Summary Judgment, a Permanent Injunction and Monetary Relief against Defendant Mark Morrow [Doc. 189] is **GRANTED**.

It is further **ORDERED** that Defendant Mark Morrow is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

15

(c)    to engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any person;

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any

person, or (ii) disseminating false or misleading documents, materials, or

information or making, either orally or in writing, any false or misleading

statement in any communication with any investor or prospective investor, about:

    (A) any investment in or offering of securities,

    (B) the registration status of such offering or of such securities,

    (C) the prospects for success of any product or company,

    (D) the use of investor funds; or

    (E) the misappropriation of investor funds or investment proceeds.

It is further **ORDERED** that, as provided in Federal Rule of Civil Procedure

65(d)(2), the foregoing paragraph also binds the following who receive actual

notice of this Order by personal service or otherwise: (a) Defendant Morrow's

officers, agents, servants, employees, and attorneys; and (b) other persons in active

concert or participation with Morrow or with anyone described in (a).

It is further **ORDERED** that Defendant Morrow is permanently restrained

and enjoined from violating Section 17(a) of the Securities Act of 1933 (the

"Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use

of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

> (a)   to employ any device, scheme, or artifice to defraud;
>
> (b)   to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;       or
>
> (c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser;

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about:

> (A) any investment in or offering of securities,
>
> (B) the registration status of such offering or of such securities,
>
> (C) the prospects for success of any product or company,
>
> (D) the use of investor funds; or
>
> (E) the misappropriation of investor funds or investment proceeds.

17

It is further **ORDERED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise:  (a) Defendant Morrow's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Morrow or with anyone described in (a).

It is further **ORDERED** that Defendant Morrow is liable for disgorgement of $7,973,413.89, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $1,056,843.60, for a total of $9,030,260.49.  Defendant shall satisfy this obligation by paying $9,030,260.49 to the Securities and Exchange Commission within 45 days after entry of this Order.  Any amounts that Defendant Morrow pays toward the restitution ordered in his criminal case United States v. Morrow, No. 1:15-CR-459 (N.D. Ga.), shall be credited toward the disgorgement he is ordered to pay as part of this judgment.  Defendant Morrow shall notify the Commission of, and provide proof of, any such payments.

Defendant Morrow may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also

pay by certified check, bank cashier's check, or United States postal money order

payable to the Securities and Exchange Commission, which shall be delivered or

mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number,

and name of this Court; Mark Morrow as a defendant in this action; and specifying

that payment is made pursuant to this Order.

Defendant Morrow shall simultaneously transmit photocopies of evidence of

payment and case identifying information to the Commission's counsel in this

action.  By making this payment, Defendant relinquishes all legal and equitable

right, title, and interest in such funds and no part of the funds shall be returned to

Defendant Morrow.

The Commission shall hold the funds (collectively, the "Fund") and may

propose a plan to distribute the Fund subject to the Court's approval.  The Court

shall retain jurisdiction over the administration of any distribution of the Fund.  If

the Commission staff determines that the Fund will not be distributed, the

Commission shall send the funds paid pursuant to this Order to the United States

Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 45 days following entry of this Order.  Defendant Morrow shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

It is further **ORDERED** that Defendant Morrow shall pay a civil penalty in the amount of $1,000,000.00 to the Securities and Exchange Commission pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  Defendant shall make this payment within 45 days after entry of this Order.

Defendant Morrow may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

20

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Mark Morrow as a defendant in this action; and specifying that payment is made pursuant to this Order.

Defendant Morrow shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Order to the United States Treasury. Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.

It is further **ORDERED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Order.

**IT IS SO ORDERED** this 24th day of July, 2018.

MARK H. COHEN
United States District Judge